

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 5, 2026

**BY ECF**

The Honorable Victor Marrero
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

>       Re:    *United States v. Weidong Guan*, 24 Cr. 322 (VM)

Dear Judge Marrero:

The Government respectfully writes in the above-captioned matter to identify for the Court evidence related to the conduct that the defendant moved *in limine* to exclude as allegedly uncharged conduct, on which the Court reserved decision (Dkt. 190 at 24-27).  As set forth below, all of this conduct is part of or inextricably intertwined with the evidence of the offense conduct and should be admitted.  Indeed, the Government respectfully requests a ruling in advance of opening statements, since the categories of evidence summarized herein (many of which are explicitly referenced in the Indictment) are part of the Government's theory of the case.

>    1.       *Category 3: asking others to purchase products in the United States with gift cards and/or debit cards so that the products could be shipped back to Vietnam*[1]

The charges in this case arise out of the defendant's decision to have the MMO Team transfer the proceeds of gift cards—including fraud proceeds loaded on those cards—to the Epoch Entities.  That transfer was carried out in part by a series of layered financial transactions described in the Indictment.  (*See* Indictment ¶ 3 ("Members of the MMO Team and other scheme participants moved the crime proceeds into the Media Entities' accounts through tens of thousands of layered transactions utilizing, among other things, prepaid debit cards and financial accounts that were opened using stolen identification information, including the personal identification information of U.S. residents.")).  It was also carried out in part by "checkout" activities, which refer to the purchase of goods with gift cards and shipping those goods, as a way of surreptitiously transferring the proceeds of the gift cards.

---

[1] In numbering the categories of evidence summarized in this letter, the Government follows the numbering in its original notice letter, which was used by the parties and the Court in connection with the motions *in limine*.  (*See* Dkt. 190 at 24-25).

Honorable Victor Marrero
July 5, 2026
Page 2

In short, the scheme was principally carried out in two ways in its early stages: moving proceeds of the MMO Team's gift card trading activities to the Epoch Entities through layered financial transactions, and using those proceeds to purchase goods that were shipped to the Epoch Entities. Evidence of the latter conduct—that is, "checkout"—the Government noticed as direct evidence, or in the alternative, admissible pursuant to Rule 404(b). And it is both.

A.      *Background*

The origins of the charged money laundering scheme include the defendant and another MMO Team leader (the "MMO VP"), receiving a briefing on "checkout" activities. (*See* GX 801 rows 1-3). The defendant and the MMO VP went on to oversee the MMO Team in obtaining gift cards and prepaid debit cards and transferring their proceeds into the Epoch Entities both through this "checkout" activity and also through the sham charitable donations referenced in the Indictment, which, as described above, were a different way of surreptitiously transferring the proceeds of the gift cards to the Epoch Entities. (*See* Indictment ¶ 3).

While, as described above, there were two principal ways in which the scheme was carried out, the Indictment charges a single scheme, and the evidence at trial is expected to demonstrate just that. Indeed, the MMO Team's two means of transmitting gift card proceeds to the Media Entities—*i.e.*, both through the financial transactions including "layered transactions" (Indictment ¶ 3) and through the use of those gift cards to purchase items to be shipped to the Epoch Entities—were both treated by the MMO Team and by the Epoch Entities as parts of the same overall project and were tracked together on spreadsheets maintained by the MMO Team's chief accountant. (*See* GX 3201UR (tracking MMO team's transfers of funds to Vietnamese affiliate both through "Checkout" activities and through teams conducting the sham charitable donations); GX 801 row 194, 242 (communications reflecting mission of MMO Team to fund Epoch Entities)). So intertwined was the "checkout" activity with the other MMO Team activity that a Facebook group that co-defendant and co-conspirator Hung created to recruit members to the MMO Team included "Checkout" in the group name: "https://facebook.com/groups/1clickmmocheckout/." (*See* GX 801 row 224).

A number of the individuals Hung recruited to carry out the "layered transactions" (Indictment ¶ 3) were also recruited to engage in the "checkout" activity. Indeed, when initially communicating with two of these individuals who would go on to carry out the "layered transactions" as nominee accountholders ("Nominee-1" and "Nominee-2"), Hung sent an introductory message to each of them, referring to *both* checkout activities *and* financial account nominee activities together in the same Facebook message. (*See* GX 801 rows 494-95 (Hung to Nominee-1: *[I have the following services and would like to collaborate with you. Need Amazon account to purchase goods on Amazon. Earn 3% of revenue. Need Venmo account to pay for goods. Earn 5% of revenue Need to receive mail sent in the US, just take picture upon receipt and send it to me. Negotiable]*); *see also id.* rows 469-71 (initial Hung communications with Nominee-1); *see also id.* row 507 (Nominee-2 to Hung: *[Hello, I see that you are recruiting people in the U.S. to check out. I currently live in San Jose.]*); *id.* row 510 (Hung to Nominee-2: *[I have the following services and would like to collaborate with you. Need Amazon account to purchase goods on Amazon. Earn 3% revenue Need Venmo account to pay for goods. Earn 5% revenue*

Honorable Victor Marrero
July 5, 2026
Page 3

*Need to receive mail sent to the US, just take picture upon receipt and send it to me. Negotiable]*);
*id.* rows 507-23 (Hung and Nominee-2 introductory communications)).[2]

Hung and the MMO Team then used these two nominees' accounts (either in the nominees' own names, or in the names of others but using Nominee-1's and Nominee-2's addresses) to be used for transactions that are among the numerous sham donations charged in the Indictment. (*See, e.g.*, GX 901 sheet 26, 28, 29 (financial tracing showing multiple charged transfers to the Epoch Entities through Nominee-1 Green Dot cards); GX 901 sheet 20 (financial tracing showing charged transfers to the Epoch Entities through Nominee-2 Venmo account, following purchase on Paxful); Indictment ¶ 3).

B.     *Discussion*

As an initial matter, by being part of the same "series of transactions as the charged offense," the checkout activity is "inextricably intertwined with the evidence regarding the charged offense," and "necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (internal quotation marks omitted). This is so because the charged money laundering scheme revolved, centrally, around the MMO Team sending gift card proceeds and other funds, including crime proceeds, to the Epoch Entities in a series of transactions intended to conceal or disguise the nature, location, source, ownership, and control of the funds. (*See* Indictment ¶¶ 1-5, 8). Accordingly, the full range of such transactions—*i.e.*, including not only the transfer of gift card proceeds directly to the Epoch Entities as online donations but also the transfer of gift card proceeds through purchasing and shipping valuable items with those proceeds—are all part of the same "series of transactions" and should all be admitted as direct evidence. *Gonzalez*, 110 F.3d at 942 (internal quotation marks omitted). Indeed, to consider the latter activity as somehow separate would be counter to how the persons who carried out the scheme themselves talked about it, as described above.

Given the chronological sequence of events leading from the discussion of "checkout" activity to the carrying out of both that activity and the layered transactions described in the Indictment, reference to this "checkout" activity is necessary to "complete the story of the crime on trial." *Gonzalez*, 110 F.3d at 942 (internal quotation marks omitted). Indeed, removing the reference to "checkout" activities from Hung's communications with Nominee-1 and Nominee-2 would require redacting and parsing out portions of the very same messages that explain the genesis of certain of the charged money laundering transactions. (*See* GX 801 row 494 (Hung to Nominee-1); *id.* row 510 (Hung to Nominee-2)). The defendant is not entitled to prevent the jury from considering coherent and narratively cohesive evidence of his guilt. *Cf.* Fed. R. Evid. 106.

But even if the checkout activity were not direct evidence (and it is direct evidence), it is in any event admissible under Rule 404. Removing the reference to the briefing that the defendant and the MMO VP received leading up to their initiating the money laundering scheme would present a counter-factual story and would lead the jury not to understand "the background of the conspiracy charged" or "how the illegal relationship between participants in the crime developed." *See, e.g.*, *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (evidence admissible to "inform

---

[2] Text in brackets and italics signifies a translation.

Honorable Victor Marrero
July 5, 2026
Page 4

the jury of the background of the conspiracy charged, to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." (internal quotation marks omitted)); *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (other act evidence admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.").

Moreover, evidence concerning the checkout activity is highly probative of the defendant's knowledge and awareness of the activities of the MMO Team in conducting the charged transactions, as the initial briefing made the defendant aware—including through a video tutorial—of the practice of using a U.S.-based nominee to unfreeze the accounts involved in this purchasing activity when the relevant company (in that case Amazon) imposed freezes. (*See* GX 801 row 3 & GX 4D-1). This *modus operandi* was continued by the MMO Team in the course of conducting the charged money laundering transactions, as Hung attempted to enlist U.S.-based nominees to unfreeze accounts (in this case financial accounts) by impersonating the accountholder. (*See, e.g.*, GX 801 rows 725-28, 732-33, 744-54 (Le Van Hung asking Nominee-2 to call bank to unlock account in the name of identity theft victim); *id.* rows 759-75 (Hung asking Nominee-1 to call PayPal to unlock account)). Accordingly, even aside from the fact that it constitutes direct proof of the charged offenses, this "checkout" evidence is admissible to prove the defendant's knowledge and intent. *See, e.g.*, *United States v. Martino*, 759 F.2d 998, 1004 (2d Cir. 1985); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."); *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("Where, for example, the defendant does not deny that he was present during a narcotics transaction but simply denies wrongdoing, evidence of other similar narcotics involvement may, in appropriate circumstances, be admitted to show knowledge or intent."); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) ("When a defendant disavows awareness that a crime was being perpetrated, and the government bears the burden of proving" the defendant's knowledge "as an element of the crime, knowledge is properly put in issue.").

In sum, for multiple reasons, the Government should be permitted to present evidence of the MMO Team's transmission of gift card proceeds to the Epoch Entities not only through financial transactions (Indictment ¶ 3) but also through the shipping of consumer goods purchased with those proceeds through checkout activity. This was one scheme, executed principally in two ways, as the evidence will show the defendant well understood and intended.

2. *Category 4: commissioning the creation of identification documents in others' names*

Commissioning the creation of identification documents in others' names is part of how the charged "layered transactions" described in the Indictment (Indictment ¶ 3) were conducted, and thus is direct evidence not only of the same "series of transactions" charged, but the same transactions themselves. *Gonzalez*, 110 F.3d at 942.

Honorable Victor Marrero
July 5, 2026
Page 5

### A.    *Background*

A number of the charged transactions were conducted through the use of nominee accounts to engage in layered transactions, as set forth in the Indictment.  (*See* Indictment ¶ 3 ("Members of the MMO Team and other scheme participants moved the crime proceeds into the Media Entities' accounts through *tens of thousands of layered transactions* utilizing, among other things, *prepaid debit cards and financial accounts that were opened using stolen identification information*, including the personal identification information of U.S. residents." (emphasis added))).  Part of how the MMO Team was able to obtain access to such nominee accounts was by commissioning fraudulent identification documents using the personally identifiable information ("PII") of identity theft victims, and then using those documents to open accounts in the names of those unsuspecting identity theft victims.  (*See, e.g.*, GX 801 rows 417-25 (Hung asking coconspirator to make passport in the name of identity theft victim ("PII Victim-1")); *id.* rows 862-76 (Nominee-3 using address to receive Green Dot cards, including card in the name of PII Victim-1); GX 901 sheet 31 row 7 (opening of Green Dot account in the name of PII Victim-1)).

Those accounts were then used to make layered transactions sending crime proceeds to the Epoch Entities in a manner designed to conceal the nature, location, source, ownership, and control of the proceeds.  (*See, e.g.*, GX 901 sheet 31 (financial tracing showing Green Dot card in the name of PII Victim-1 being used to transfer funds to Epoch Entities)).  This process was repeated with multiple identity theft victims, for whom fake identification documents were made and in whose name payment accounts were opened for the purpose of enabling the layered money laundering transactions.  (*See, e.g.*, GX 801 rows 473-93 (Hung ordering the creation of identification documents for PII Victim-2 and negotiating with supplier for bulk discount); *id.* rows 499, 506 (Hung receiving and forwarded fraudulent PII Victim-2 identification documents); GX 852 rows 1, 2, 8, 20 (spreadsheets maintained by MMO Team tracking PII Victim-2 and other financial accounts)).

### B.    *Discussion*

The creation of fake identification documents was a crucial means by which the defendant's MMO Team conducted the charged "layered transactions" (Indictment ¶ 3), namely, that accounts "were opened using stolen identification information, including the personal identification information of U.S. residents" (*id.*) so as to engage in money laundering transactions.  For example, the creation of PII Victim-1's passport with his "stolen identification information" (Indictment ¶ 3; *see* GX 801 rows 417-25) was used to "open[]" a Green Dot account in PII Victim-1's name (Indictment ¶ 3; *see* GX 901 sheet 31 row 7), which was then used to conduct charged "layered transactions" (Indictment ¶ 3; *see* GX 901 sheet 31 rows 11-12, 15).  This evidence, in short, is direct evidence, as expressly alleged in the Indictment, of the charged money laundering scheme.

In any event, again, even if this evidence were not direct evidence (and it is direct evidence), it is admissible under Rule 404(b).  Indeed, the use of fabricated identification documents is plainly highly probative evidence of the knowledge, intent, plan, and absence of mistake of the MMO Team and of the defendant, who worked in close coordination with the MMO

Honorable Victor Marrero
July 5, 2026
Page 6

Team.  *See Martino*, 759 F.2d at 1004.  No more is required to find the evidence admissible, but it bears noting that, based on prior briefing, it appears that the defendant is likely to argue that he did not know that the charged transactions involved the proceeds of any form of unlawful activity, and indeed, has indicated his intent to argue that he engaged in financial transactions in a surreptitious manner not "to violate the law" but "out of his fear and knowledge that the CCP was watching him and seeking to infiltrate every aspect of his life."  (*See, e.g.*, Dkt. 182 at 11).  Evidence that these financial transactions were carried out in a blatantly unlawful manner by involving the commissioning of wholly false identification documents directly refute this asserted defense and prove his awareness that the conduct was unlawful.  *See, e.g.*, *Zackson*, 12 F.3d at 1182; *Ramirez*, 894 F.2d at 568.

3.    *Category 5: the bulk purchase of stolen personally identifiable information*

The MMO Team carried out the charged transactions in the Indictment through the bulk purchase of stolen PII, and the use of such stolen PII was specifically identified in the Indictment as part of the charged conduct.  Accordingly, as with the other evidence described herein, it is direct evidence (and again, it is also admissible under Rule 404(b).

A.    *Background*

Even without fabricating identification documents in all cases, the MMO Team used vast quantities of "stolen identification information, including the personal identification information of U.S. residents" (Indictment ¶ 3), in order to maintain access to a network of nominee "prepaid debit cards and financial accounts" (*id.*), for use in conducting the charged "layered transactions" (*id.*; *see also id.* ¶ 9 ("To execute the Money Laundering Scheme, individuals employed by or affiliated with the Media Entities, located both in the United States and overseas, used stolen personal identification information to open accounts, including prepaid debit card accounts, cryptocurrency accounts, and bank accounts, that were used to transfer the crime proceeds to the Media Entities' Bank Accounts")).  For example, Hung obtained files of stolen information for multiple victims (often files of 100 victims at a time), and the MMO Team used payment accounts for those victims to conduct the charged layered transactions.  (*See, e.g.*, GX 801 rows 613-21 (Hung receiving file of 100 Chime accounts, including one using the stolen PII of PII Victim-3); GX 901 sheet 33 (financial tracing showing transfer of funds to Epoch Entities through PII Victim-3 Chime account); *see also* GX 801 rows 496-98 (use of Zelle account in PII Victim-3's name to receive funds on Paxful); *id.* row 411 (creation of PII Victim-3's payment account)).

The MMO Team obtained, and maintained, this stolen PII in bulk quantities.  (*See* GX 801 rows 536-59 (sale of 44 Chime accounts containing PII); *see also, e.g.*, *id.* row 801 (85 Chime accounts containing PII)).  The PII was tracked in numerous spreadsheets associating it with the nominee financial accounts that were to be used to conduct the layered money laundering transactions charged in the Indictment.  (*See, e.g.*, GX 852 rows 1-2, 4-5, 8 (spreadsheets tracking PII including for PII Victim-1, PII Victim-2, PII Victim-3, PII Victim-4, PII Victim-5, PII Victim-6); GX 901 sheet 7 (financial tracing showing layered transaction to Epoch Entities through PII Victim-4 Green Dot Account); *id.* sheet 20 (financial tracing showing layered transaction to Epoch Entities through PII Victim-5 Venmo account); *see also* GX 801 row 894 (Nominee-4 sending Hung photograph of Green Dot card in the name of PII Victim-5); *id.* rows 1314-26, 1331-37

Honorable Victor Marrero
July 5, 2026
Page 7

(Nominee-1 depositing checks in the name of PII Victim-6 in attempt to generate cashier's check to send to defendant)).  Hung even hosted a Facebook group where such identification was openly trafficked (*see, e.g.*, GX 801 row 1158 (offer of Know Your Customer photographs including identifying information)), and repeatedly asked nominees to use some of this stolen PII in order to attempt to reopen frozen accounts to use as part of the money laundering scheme (*see, e.g.*, *id.* rows 725-28, 732-33, 744-54 (Hung asking Nominee-2 to unlock Citibank account in the name of PII Victim-3); *id.* rows 759-75 (Hung asking Nominee-1 to unlock PayPal account).

B.    *Discussion*

This evidence is plainly direct evidence of the charged offenses, as it concerns the means by which the very "same transaction or series transactions as the charged offense" were carried out.  *Gonzalez*, 110 F.3d at 942.  For example, the "stolen identification" of PII Victim-4 (Indictment ¶ 3; *see* GX 852 rows 1-2, 4-5, 8) was used to "open[]" a Green Dot account in PII Victim-4's name (Indictment ¶ 3; *see, e.g.*, GX 901 sheet 7 row 1), through which "layered transactions" (Indictment ¶ 3; *see, e.g.*, GX 901 sheet 7 rows 10, 13) were conducted.

To preclude this evidence would be tantamount to striking large portions of paragraphs 3 and 9 of the Indictment.  (*See* Indictment ¶ 3 ("Members of the MMO Team and other scheme participants moved the crime proceeds into the Media Entities' accounts through tens of thousands of layered transactions utilizing, among other things, prepaid debit cards and financial accounts that were opened using *stolen identification information, including the personal identification information of U.S. residents*." (emphasis added)); *id.* ¶ 9 ("To execute the Money Laundering Scheme, individuals employed by or affiliated with the Media Entities, located both in the United States and overseas, *used stolen personal identification information to open accounts*, including prepaid debit card accounts, cryptocurrency accounts, and bank accounts, that were used to transfer the crime proceeds to the Media Entities' Bank Accounts." (emphasis added)).  It is also, in any event, relevant to prove the defendant's knowledge, intent, plan, and absence of mistake and therefore admissible in the alternative under Rule 404(b).  *See, e.g.*, *Martino*, 759 F.2d at 1004; *Zackson*, 12 F.3d at 1182; *Ramirez*, 894 F.2d at 568.  It should be admitted, so that the Government has a fair opportunity to prove what it charged, not merely a subset, as the defendant may prefer.

4.    *Category 6: engaging in or receiving the proceeds of business email compromise schemes*

Among the charged money laundering transactions are a series of transactions leading to the transfer to the Epoch Entities of several hundred dollars stolen in a business email compromise scheme.  As set forth in detail in a series of documents summarized in Government Exhibit 901, a business email compromise scheme targeted a nonprofit organization in Maine, and the proceeds of that scheme were transferred through a series of layered transactions into a Green Dot account controlled by the MMO Team, and then to the Epoch Entities along with the other charged money laundering transactions.  (*See* GX 901 sheet 32 (chronology of communications and financial tracing of business email compromise scheme and transfer of proceeds of that scheme to Epoch

Honorable Victor Marrero
July 5, 2026
Page 8

Entities); GX 852 rows 2, 6, 7, 8 (MMO Team spreadsheets tracking email account used to operate Green Dot account used in transaction)).[3]

These transactions are among those that the Government specified in detail that it intended to prove as part of the series of layered transactions charged in the Indictment.  (Indictment ¶¶ 3, 8; *see also* Dkt. 162 at 29-30 (citing, *e.g.*, GX 2A-100UR); GX 2A-100UR (customer key 247330536)).  Thus the underlying fraud (*see* GX 901 sheet 32 rows 5-8) is an instance of the wire fraud specified unlawful activity as alleged in the Indictment.  Similarly, the transactions laundering the proceeds of that specified unlawful activity (*see id.* rows 9-10) are among the laundering transactions alleged in the Indictment.  Since both specified unlawful activity and a financial transaction are elements of the object of the money laundering conspiracy, these are "the same transaction or series of transactions as the charged offense," *Gonzalez*, 110 F.3d at 942, and should not be excluded any more than any other charged transactions as part of the scheme.

In any event, again, the receipt by the defendant of the proceeds of fraud from the MMO Team using the exact same *modus operandi* of layered transactions through nominee accounts tracked in the same spreadsheets as the rest of the scheme, would serve the Rule 404(b) purposes of proving knowledge, intent, preparation, plan, and absence of mistake or accident even if it was not (as it is) part of the charged offense.  *See, e.g.*, *Martino*, 759 F.2d at 1004; *Zackson*, 12 F.3d at 1182; *Ramirez*, 894 F.2d at 568.

     5.    *Category 8: commissioning the use of the financial or electronic accounts of other persons, or the bulk purchase of such accounts in the names of other persons*

Another category of evidence directly drawn from the Indictment concerns the purchase, or commissioning the use, of financial accounts and electronic accounts of other persons.  This category, which overlaps in substantial measure with the evidence of the bulk purchase of stolen identification information, is part of the same conduct explicitly referenced in the Indictment.  It thus again is direct evidence (and again also admissible under Rule 404(b)).

     A.    *Background*

In order to conduct the "tens of thousands of layered transactions" charged in the Indictment through "prepaid debit cards and financial accounts" in the names of multiple individuals (Indictment ¶ 3), the MMO Team at times purchased control over large numbers of such accounts.  (*See, e.g.*, GX 801 rows 536-59 (Hung obtaining 44 Chime accounts); *id.* rows 613-21 (Hung obtaining 100 Chime accounts, including that of PII Victim-3); *id.* rows 656-65 (Hung discussing price for Chime accounts); *id.* row 801 (Hung obtaining 85 Chime accounts); *id.* rows 258, 793 (Hung obtaining batches of Payoneer accounts); *see also, e.g.*, GX 901 sheet 33 (financial tracing of transfer to Epoch Entities through PII Victim-3 Chime account)).

---

[3] The Government presently intends to call a former employee of the nonprofit organization as a witness.  (*See, e.g.*, 3527-003).

Honorable Victor Marrero
July 5, 2026
Page 9

Another means by which the MMO Team obtained access to such "prepaid debit cards and financial accounts" (Indictment ¶ 3) in order to conduct the "layered transactions" (*id.*) was to commission the use of such accounts in the names of nominees, as described in part above. (*See, e.g.*, GX 801 rows 494-95 (Hung offering Nominee-1 a percentage-based fee for use of Nominee-1's accounts); *id.* rows 562-78, 599-604, 622-23, 625-26, 628-30, 632-51, 734-36, 779-80, 759-75, 809-10 (Hung communications with Nominee-1 regarding use of Nominee-1's Venmo account and opening and use of multiple Green Dot accounts); *id.* row 668 (use of Nominee-1 account to transfer funds to Epoch Entities); GX 901 sheets 26, 28, 29 (financial tracing involving use of Nominee-1 account to transfer funds to Epoch Entities); GX 801 rows 507-23 (Hung offering Nominee-2 a percentage-based fee for use of Nominee-2's accounts); *id.* rows 671-86, 781, 783-85, 787-91, 794-95 (Hung using Nominee-2's address to send PayPal, Green Dot, and Venmo cards); *id.* rows 688-701 (Hung discussion of use of Nominee-2 Venmo account)).

Indeed, as described in part above, Hung created a Facebook group on which account brokers would offer for sale payment accounts and other electronic accounts (including Paxful accounts) in order to allow members to access and use those accounts. (*See* GX 801 rows 942, 1004, 1005 (offer of PayPal accounts for sale); *id.* row 1096 (offer of Paxful and bank accounts for sale); *id.* row 1342 (offer of cryptocurrency account for sale); *id.* rows 1500-01 (offer of Green Dot and other accounts for sale)).

The maintenance of these large networks of nominee accounts was a large project, necessitating extensive support and upkeep. As with the "checkout" activities described above, in order to maintain such accounts, the MMO Team would enlist nominees to contact banks and other institutions to attempt to unfreeze the fraudulent accounts. (*See* GX 801 rows 759-75 (Hung asking Nominee-1 to call to unlock PayPal account); *id.* rows 725-28, 732-33, 744-54, 792 (Hung asking Nominee-2 to call to unlock PII Victim-3 Citibank account)). MMO Team members similarly would test the usability of these accounts, sometimes complaining to their suppliers if the accounts they had purchased were not functional. (*See, e.g.*, GX 801 rows 707-22 (MMO Team supervisor complaining regarding unusable Chime account)). Similarly, Hung and other MMO Team members maintained spreadsheets tracking these accounts and their status, and providing instructions to the MMO Team as to how these accounts were to be used in carrying out the charged money laundering scheme. (*See, e.g.*, GX 852 row 3 (list of email accounts, including notations as to which accounts have not yet had corresponding Green Dot accounts created); *id.* row 4 (list of Chime accounts); *id.* rows 6-7 (spreadsheets of email addresses, including numerous email addresses used in the financial tracings summarized in GX 901); *id.* row 10 (list of PayPal accounts with instructions for MMO Team members to input their profit margins on "Pax")).

B.    *Discussion*

Given that the Indictment specifically alleges the carrying out of "tens of thousands of layered transactions" through "prepaid debit cards and financial accounts" in the names of multiple individuals (Indictment ¶ 3), the evidence of the commissioning, use, and maintenance of such accounts is direct proof of the literal allegations of the Indictment. For example, the MMO Team obtaining access to a "financial account that w[as] opened using stolen identification information" of PII Victim-3 (Indictment ¶ 3; *see* GX 801 rows 613-21), enabled the team to use the account to conduct "layered transactions" alleged in the Indictment (Indictment ¶ 3; *see* GX 901 sheet 33).

Honorable Victor Marrero
July 5, 2026
Page 10

There is no basis to present the jury with an artificially truncated and less cohesive narrative by excluding plainly admissible evidence proving conduct that is expressly alleged to be part of the scheme in the Indictment.

In the alternative, the fraudulent use of accounts opened in the names of others is admissible under Rule 404(b) to prove the defendant's knowledge and intent given the extensive evidence of the defendant's sharing of his own account credentials with MMO Team members. The defendant, during the course of the scheme, allowed his own accounts to be used as nominee accounts in a highly similar way to the other nominees. (*See* GX 801 rows 169-70 (Kraken account); *id.* rows 310, 325, 340 (Gemini account); *id.* rows 651-54 (PayPal account); *id.* row 205 (Zelle account); *id.* row 651-54 (PayPal account)). Given the "similarity" and "connection" between the defendant's conduct as a nominee and the conduct of others such as Nominee-1 and Nominee-2—who were in direct contact with the defendant's trusted lieutenant Hung and engaged in the same enterprise as the defendant—this use of nominee accounts is admissible to prove knowledge and intent. *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002); *see also Zackson*, 12 F.3d at 1182; *Ramirez*, 894 F.2d at 568.

6.    *Category 9: the mailing of checks in the names of other persons to Guan or to other co-conspirators for deposit in bank accounts controlled by Guan*

In order to continue the money laundering scheme after banks and cryptocurrency exchanges began freezing and terminating their accounts, the defendant and the MMO Team adapted their techniques by using different means to transmit the proceeds of the MMO Team's gift card trading activities. One of those means was through the mailing of checks and money orders to the defendant, or the use of nominees to deposit checks into bank accounts controlled by the defendant. As this conduct is necessary to complete the story of the offense and in any event admissible under Rule 404(b), it should be admitted.

A.    *Background*

As the "sprawling, transnational scheme to launder at least approximately $67 million of illegally obtained funds" progressed (Indictment ¶ 1), and as the defendant received a number of "complaints and concerns raised by bank, cryptocurrency companies, and others" (*id.* ¶ 5; *see also id.* ¶ 11), participants in the scheme (including the defendant, Hung, and other members of the MMO Team), adapted their techniques to continue moving stolen funds to the Epoch Entities. For example, following a series of inquiries from banks (Indictment ¶ 11.a, c, d), and the closure of several of the entities' bank accounts (*see, e.g.*, GX 801 row 1103), Hung worked with Nominee-1 to send funds to the defendant directly, first by mailing them to the defendant (*see id.* rows 1167-86, 1191-98, 1203-28), then by collecting and depositing checks—including checks in the name of PII Victim-6—for the purpose of generating cashier's checks and depositing them directly into an Epoch Entities' bank account on which the defendant was the sole signatory. (*See* GX 801 rows 1229-1235, 1241-55, 1263-66, 1274-79, 1287-300, 1314-26, 1330-37 (Hung communications with Nominee-1 about check deposit and cashier's check); *id.* rows 1341, 1343-44, 1351-52, 1355-64 (Hung, Nominee-1, and defendant communications and records showing defendant was monitoring account to ensure deposit was made); *id.* rows 1416-17 (deposit of second Nominee-1 cashier's check); GX 803 row 16 (defendant signatory on accounts)).

Honorable Victor Marrero
July 5, 2026
Page 11

Similarly, following a number of inquiries by the defendant's cryptocurrency exchanges, which the defendant declined to answer (*see* Indictment ¶ 11.f, g), and the cryptocurrency exchanges' closing the defendant's accounts as a result (*see* GX 801 row 1538, 1561), Hung and other MMO Team members continued the laundering scheme by surreptitiously sending the defendant crime proceeds—including in the form of checks in the names of another person, but at an address controlled by the MMO Team—for the defendant to deposit. (*See* GX 801 rows 1604-18 (messages between Hung and "Bạn Châu Phi Nigieria Bán Gift And Usdt" regarding sending money order to the defendant), *id.* rows 1627-37 (MMO Team member sending checks in the name of a third party, listing an MMO-controlled address, to the defendant's home address); *see also id.* rows 1630, 1637 (defendant acknowledging that payee on the checks did not endorse them to defendant, but depositing checks into his account regardless)).

## B.    *Discussion*

As these acts continued the same overall money laundering scheme by different means, in adaptation to the very events recited in the Indictment, they again are part of, or "inextricably intertwined with the evidence regarding," the underlying offense, and "necessary to complete the story of the crime on trial." *Gonzalez*, 110 F.3d at 942 (internal quotation marks omitted). They are also highly relevant to show the defendant's intent, motive, knowledge, and absence of mistake or accident, as they show him using surreptitious and deceptive means to receive additional funds for the benefit of the Epoch Entities, which the charged scheme alleges he intended to benefit (Indictment ¶ 1). *See, e.g.*, *Martino*, 759 F.2d at 1004; *Garcia*, 291 F.3d at 137; *Zackson*, 12 F.3d at 1182; *Ramirez*, 894 F.2d at 568.

They also bear particular, direct relevance to the bank fraud counts in the Indictment (Count Two and Count Three), because they show the means to which the defendant resorted to transfer money when his lies failed to preserve his access to his accounts. In particular, they are highly relevant to prove that when the defendant made false statements to bank representatives, he did so intentionally. *See, e.g.*, *Ramirez*, 894 F.2d at 569 ("Relevancy cannot be reduced to mere chronology; whether the similar act evidence occurred prior or subsequent to the crime in question is not necessarily determinative to its admissibility"). The evidence is thus admissible for numerous reasons.

7.    *Category 10: the creation of payment processing or other financial accounts under false and fraudulent customer information or the transfer of funds using false and fraudulent payment descriptions*

Another method by which the defendant adapted to the closure of his companies' bank accounts and his cryptocurrency accounts was to open numerous additional payment processing accounts using fraudulent descriptors intended to conceal the accounts' connection to the Epoch Entities, and to send fund transfers through banks using false and fraudulent payment descriptions. Since this conduct too completes the story and powerfully serves multiple Rule 404(b) purposes, it should be admitted.

Honorable Victor Marrero
July 5, 2026
Page 12

A.    *Background*

As a different means of adapting the "sprawling, transnational scheme to launder at least approximately $67 million of illegally obtained funds" (Indictment ¶ 1), following the inquiries and interventions from banks and cryptocurrency exchanges (*id.* ¶¶ 5, 11), the defendant and other members of the MMO Team implemented transactions, and at times set up entire payment processing accounts, based on false and misleading information as a way to continue to transfer the proceeds of the MMO Team's continued gift card activities to the Epoch Entities.  For example, the defendant worked with an MMO Team supervisor to set up a large number of Stripe payment processor accounts (*see, e.g.*, GX 801 rows 1565-70), and set up a payment processor account for a company disguised as a "diverse community of food enthusiasts, chefs, and home cooks" (*id.* row 1571), and discussed changing the descriptors provided to the banks in order to conceal any connection to the Epoch Entities (*see id.* rows 1572-77, 1598).  The defendant and this MMO Team supervisor also discussed a plan to proliferate payment processor accounts to avoid the spikes in volume of transactions that had triggered the bank inquiries described in the Indictment. (*See, e.g.*, GX 801 rows 1599-603; *see also id.* at 1602 (MMO Team supervisor to defendant: "Each type of cards should be used at a maximum number of 5 per day, to minimum the risk of being blocked.  So we need to have many gateways so I can test which method works best")). Similar to Guan's bank and cryptocurrency accounts following the inquiries described in the Indictment (Indictment ¶ 11.a, c, d, f-g), these accounts were treated as disposable and abandoned over time.  (*See* GX 801 rows 1622-25).  Similarly, in addition to discussing the creation of additional payment processing accounts with the MMO VP (GX 801 rows 1580-86), the defendant instructed her to send a wire transfer of the proceeds of MMO Team's continued gift card activities under the false and fraudulent payment description of "Promotion fees" (*id.* rows 1587-97).

B.    *Discussion*

This activity, as with the direct mailing of MMO Team-derived checks to the defendant, and the other conduct described above, is plainly "necessary to complete the story of the crime on trial," *Gonzalez*, 110 F.3d at 943 (internal quotation marks omitted), as it amounts to a direct response to the inquiries made by banks and cryptocurrency exchanges described in the Indictment, shows the defendant's intent to continue the scheme by alternate means, and shows that his statements to the bank representatives were made intentionally.  And again, as with the other evidence related to check mailings and check deposits described above—but with particular force given the affirmative misrepresentations the defendant made in, for example, describing a transfer of MMO Team proceeds as "promotion fees"—this evidence is also admissible under Rule 404(b) to prove the defendant's intent, motive, knowledge, and absence of mistake or accident.

Honorable Victor Marrero
July 5, 2026
Page 13

*See, e.g.*, *Martino*, 759 F.2d at 1004; *Garcia*, 291 F.3d at 137; *Zackson*, 12 F.3d at 1182; *Ramirez*, 894 F.2d at 568.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:   s/_____
            Benjamin M. Burkett
            Rebecca T. Dell
            Paul M. Monteleoni
            Amanda C. Weingarten
            Assistant United States Attorneys
            (212) 637-2455/2198/2219/2257

cc:   (by ECF)

      Counsel of Record